IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERRAY GRAHAM o/b/o Z.K., a minor | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner of Social Security | : | NO. 21-4843 |

**O P I N I O N**

SCOTT W. REID                                                      DATE: June 23, 2022
U.S. MAGISTRATE JUDGE

Sherray Graham brought this action under 42 U.S.C. §405(g) on behalf of her daughter, Z.K., to obtain review of the decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI"). Graham has filed a Request for Review to which the Commissioner has responded. As explained below, I will grant Graham's Request for Review and order this case remanded to the Agency for more thorough consideration of all the evidence, and discussion of the basis for all determinations regarding expert opinions.

I.      *Factual and Procedural Background*

Z.K. was born on January 23, 2009. Record at 156. At the time of her hearing before the Administrative Law Judge ("ALJ"), as discussed below, she had turned twelve years old a few days earlier, and was in the sixth grade. Record at 33. On November 5, 2019, Graham filed an application on her daughter's behalf, alleging disability since January 1, 2015, on the basis of left eye blindness, ADHD (attention deficit hyperactivity disorder), ODD (oppositional defiance disorder), and depression. Record at 156, 157, 175.

Z.K.'s application was denied originally and upon reconsideration. Record at 55 (June 17, 2020) and 56 (October 9, 2020). Graham then requested a hearing *de novo* before an ALJ.

Record at 83.  A hearing was held in this matter on January 25, 2021.  Record at 26.  On March 25, 2021, however, the ALJ issued a written decision denying relief.  Record at 12.  The Appeals Council denied Graham's request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner.  Record at 1.  Graham then filed this action on behalf of Z.K.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision.  *Richardson v. Perales*, *supra*, at 401.  A reviewing court must also ensure that the ALJ applied the proper legal standards.  *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

In evaluating a child's claim for benefits, an ALJ undertakes a three-part analysis.  First, if the claimant is engaged in work which can be considered "substantial gainful activity," the claim must be denied.  20 C.F.R. §416.924(b).  Next, the claimant's impairment or combination of impairments must be severe.  20 C.F.R. §416.924(c).  Finally, the child's impairment "must meet, medically equal, or functionally equal in severity a listed impairment" as set forth in 20 CFR Subpart 404, Subpart P, Appendix 1.  20 C.F.R. §416.924(d).  Thus, the child must be found qualified for an award of benefits at each stage of the analysis.

Where a child does not meet or equal a listing criteria, his impairment can be found to be functionally equivalent to a listed impairment where it causes "marked limitations in two domains of functioning or an extreme limitation in one domain."  20 C.F.R. §416.926a(b)(2).  A limitation is "marked" where it "interferes seriously with [a child's] ability to independently

initiate, sustain, or complete activities." 20 C.F.R. §416.926a(e)(2)(I).  An "extreme" limitation is one where a child's test scores are three standard deviations or more below the norm, or where it "interferes very seriously" with a child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. §416.926a(e)(3)(I).

The domains of functioning considered are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being.  20 CFR §416.926a.

III.    *The ALJ's Decision and Graham's Request for Review*

In her decision, the ALJ found that Z.K. had not engaged in substantial gainful activity.  Record at 13.  She determined that Z.K. suffered from the severe impairments of left eye blindness; a specific learning disability; ADHD; an autism spectrum disorder; depression; ODD, and childhood obesity.  *Id*.

At the third stage of the sequential evaluation for child disability cases, however, the ALJ found that none of Z.K.'s impairments, and no combination of impairments, met or medically equaled a listed impairment.  *Id*.  She also found that Z.K. did not have an impairment or combination of impairments that functionally equaled the severity of a listed impairment.  Record at 16.  According to the ALJ, Z.K. had "less than marked" limitations in every domain of functioning, except in moving about and manipulating objects, in which she had no limitation.  Record at 16-17.  She decided on this basis that Z.K. was not entitled to a finding of disability.

In her Request for Review, Graham claims that the ALJ erred in failing to fully address the most recent IEP (individualized education plan) developed for Z.K.'s schooling.  She also argues that that the ALJ erred in failing to explain how the evidence of record supported her

conclusions, instead stating in a conclusory manner that much of the evidence – including the reports of the consulting independent experts – was "inconsistent" with the record as a whole.

IV.     *Discussion*

    A.     *The November, 2020, IEP*

Because Z.K. has been determined by her local educational agency to have special needs, special services are provided to her through an IEP, which is a written document arrived at by a multi-disciplinary team which summarizes a child's abilities, outlines the goals for the child's education and specifies which services the child will receive.  20 U.S.C. §1414(d); *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 173 (3d Cir. 1988), *cert. denied* 488 U.S. (1989).

Z.K.'s record contains several IEPs, the most recent of which was issued in November, 2020.  Record at 316.  As the Commissioner accurately states, Graham is incorrect to the extent she argues that the ALJ "never addressed" this IEP.  Plaintiff's Brief in Support of Request for Review at 9.  The ALJ wrote:

> An IEP was done for Universal Daroff Charter School of the claimant on November 5 and 18, 2020.  It was noted that the claimant had a history of difficult behavior at school, has struggled with completing her work, and has been below grade level in both reading and math.  A Wechsler Preschool and Primary Scale of Intelligence-Fourth Edition was given and the claimant achieved a Full Scale IQ of 81.  She has struggled in math, reading, attendance, and behavior.  She received laser eye surgery to correct her left eye from wandering.  The IEP evaluators determined that the claimant has a diagnosis of emotion[al] disturbance and specific learning disability.  The claimant continued to meet the eligibility requirements for special education services in the form of learning support for more than 20 percent but less than 80 [percent] of the school day.

Record at 19.

The ALJ did not discuss the IEPs in any greater detail, but later, in evaluating the reports from the agency reviewing psychologists, at both the initial and reconsideration levels, and the reviewing agency physician at the reconsideration level, she wrote as to each:  "The undersigned

finds this DDE assessment to be consistent with the treatment and educational records, *including the educational evaluations in the record* and reported improvement to the mental health sources." Record at 20. (Emphasis supplied).

More generally, however, Graham argues – not that the ALJ never mentioned the IEP – but that she did not "fully address" the IEPs. She points out that the November, 2020, IEP post-dates the agency reviewing reconsideration reports, which were issued on October 7 and 8, 2020. It is also notable that the reviewing reconsideration psychologist, Thomas Fink, Ph.D., wrote: "It was reported that the child has an IEP in school; however the IEP was unavailable for review." Record at 63. Not only had Dr. Fink not seen the November, 2020, IEP which was not yet created, but he also had not seen the earlier IEPs which are included in the record at pages 215-274, although they appear to be listed as submitted evidence. Record at 59.

The Commissioner argues that an ALJ is entitled to rely on a physician's opinion which pre-dates new evidence unless she concludes that newer evidence might have changed the physician's opinion, citing *Chandler v. Commissioner of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). *Chandler*, however, is not on point here; it refers to evidence which is "new" in the sense that it was submitted to the Appeals Counsel only after the ALJ issued a decision. The evidence at issue here was before the ALJ. Most of it appears to have been available to Dr. Fink, as well, though he did not review it.

The question here, therefore, is whether the ALJ's view of Dr. Fink's opinions would have changed if she had realized that he never saw any of Z.K.'s IEPs. The same question exists, to some extent, regarding the reports of the other agency reviewing medical experts, none of whom saw the November, 2020, IEP.

An IEP is an important part of the record for a minor applicant. The Social Security regulations direct the Agency to consider it when determining the applicant's level of functioning. 20 C.F.R. §416.924a(b)(7)(iii). Further, as to the ability to acquire or use information, the Social Security rulings "hold out the inability to read, write, or do arithmetic at an appropriate grade level as a prime example" of a limitation. *Martin o/b/o N.D.M. v. Kijakazi*, Civ. A. No. 20-1209, 2021 WL 5987268 at *4 (E.D. Pa. Dec. 16, 2021), *citing* Social Security Ruling (SSR) 09-3p, 2009 WL 396025 at *6 (Feb. 17, 2009). Present levels of academic achievement are set forth in an IEP.

In *Martin*, cited above, the Honorable Richard A. Lloret remanded a child's claim for benefits to the agency because, although the ALJ cited the claimant's IEPs in her decision, the judge was "unable to determine the extent to which the ALJ considered pertinent information within" the IEPs. 2021 WL 5987268 at *4.

Z.K.'s case presents somewhat different facts than those in *Martin*. However, the ALJ clearly rejected some medical opinions in favor of at least one from a non-examining, agency-employed, physician who had not seen any of the IEPs, namely Dr. Fink. Given the general importance of a child claimant's IEP, this undermines the ALJ's reliance on Dr. Fink's report. It also casts some doubt on her assessments of the reports of the other agency reviewing experts, who had not seen Z.K.'s most recent IEP. However, because there are other bases for finding the ALJ's decision to be unsupported by substantial evidence, it is not necessary to decide whether this, standing alone, would warrant remand or reversal.

B.      *The ALJ's Treatment of the Evidence*

As above, Graham argues that the ALJ failed to explain how she evaluated the evidence of record, simply calling the reports she favored "consistent" and the reports upon which she did not rely "inconsistent." There is considerable merit to this argument.

First, however, the ALJ made a factual error which arguably warrants relief, standing alone. She wrote: "With regard to her mental impairments, the claimant has not had impatient [*sic* in-patient] psychiatric hospitalization, partial hospitalization, been admitted to a day program, nor been admitted to an emergency room." Record at 19.

This is untrue, and the ALJ had ample evidence before her to disprove it. Treatment notes from mental health care provider Public Health Management Corporation report that: "Client is a 7 y/o AAF admitted to Hope Springs West for increased physical aggression toward peers and family members. Client was admitted to Fairmount via CRC for 12 days and sent to Hope Springs immediately after." Record at 429, 434, 439. Public Health Management Corporation manages Wordsworth Academy, which is associated with Hope Springs West. Www.Wordsworth.org (visited June 8, 2022). Another treatment note from Public Health Management Corporation, dated October 16, 2017, stated that Z.K. was "hospitalized in partial hospital program at children crisis treatment center because of her out of control behavior." Record at 428.

Thus, treatment records from the manager of the partial hospitalization program, i.e., Hope Springs West, confirm that Z.K. had a 12-day emergency inpatient hospitalization, followed by a partial psychiatric hospitalization in a therapeutic day program. This occurred well within the relevant period, since Graham has alleged a disabled date of January 1, 2015. Record at 156.

It is not clear how the ALJ overlooked this, particularly since Graham testified at the hearing that her daughter was hospitalized a few years before the hearing. Record at 33. Beau Brendley, Psy.D., Z.K.'s independent examining mental health expert wrote: "The claimant had been hospitalized at Fairmount Behavioral Health in 2019 due to physically trying to harm herself and others." Record at 359. James Goodyear, M.D., Z.K.'s independent examining physician, also wrote that "the claimant was admitted for mental health reasons to Fairmount Hospital in 11/17, when she tried to injure herself." Record at 373.

The records reveal that Z.K. continued to receive outpatient mental health care from Public Health Management Corporation for over two years, until services were terminated on December 26, 2019. Record at 454. At the final meeting with the Public Health Management Corporation therapist, Graham was advised that she should continue to use behavioral interventions developed during treatment, and that Z.K. should continue to receive medication and outpatient services. *Id*.

This factual error by the ALJ as to the level of mental health care Z.K. required was obviously material to her decision, which explicitly cited her supposed need for no more than conservative treatment as proof that she was not disabled. Record at 19. It is impossible to say that the ALJ's view of Z.K.'s medical record could not have changed if she had taken her emergency hospitalization and partial hospitalization into account.

After hospitalization, Z.K. continued to need a high level of special educational accommodations. The record does not contain evidence relating to Z.K.'s 2017-2018 school year, but during the 2018-2019 school year at Universal Daroff Charter School she had a one-on-one aide (called a personal care assistant, or "PCA") with her at all times during the school day.

8

Record at 247, 253 (2018 IEP); 420.  Z.K. also received counseling once per week through her school IEP.  Record at 215.

As noted, Z.K. was receiving regular behavioral health services from Public Health Management Corporation at the same time.  The treatment plan defining Z.K.'s needs to Public Health Management Corporation stated: "[Z.K.] struggles with managing her emotions and feelings when she is angry and frustrated.  When [Z.K.] is frustrated she will elope, cry, scream, throw objects, engage in self abusive behaviors, and/or use physical aggression an average of 3-5 times per day."  Record at 385, 398, etc.  This is not to say that Z.K.'s behavior was always at that level, but it appears to be the baseline from which she started.  Services were sometimes provided in school with goals such as to "increase positive peer interactions," "work on the objective of increasing attention to task," "increasing cooperation with directions," and "increasing appropriate verbalization of feelings to avoid the display of frustration or temper tantrums."  Record at, *e.g.*, 399, 403, 405, 407.

Public Health Management Corporation also provided services in its office or in the home, to address Z.K.'s verbal and physical altercations with her mother and sister.  Record at 385, 400, 416, 427.  At the first home session, on October 25, 2017, her therapist noted:  "[Z.K.] experiences significant difficulties with lowered frustration tolerance and emotional dysregulation which often results in verbal and/or physical aggression."  Record at 427.

As to her academic functioning, Z.K. was provided with special education in language and math to address her learning deficits.  Record at 196 ("The student receives pull-out services for math"); 239-240, 242, 243, 310-311.  Her November, 2020, IEP stated:

> [Z.K.] demonstrates delays in decoding, reading comprehension and math operation skills which affect her ability to make progress with the 6th grade general education curriculum.  Currently, she reads independently on a mid 2nd grade level.  She also requires support

within the general education 6th grade math curriculum due to deficits with operations that include multiplication and division.

Record at 323.

Thus, Z.K. was receiving a high level of special needs support regarding both her behavior and her academic performance. As Graham suggests, the ALJ at times highlighted positive accomplishments such as good report cards, without seeming to recognize that they were achieved on a special needs level, and with the constant support of a one-on-one aide.

Indeed, some of the positive statements the ALJ quoted actually appeared in treatment notes which gave them a very different context. For example, the ALJ cited a December 8, 2020, note from Spectrum Health Services stating that Graham "does not feel that [Z.K.] needs to be back on Adderall XR. She is not 'hyperactive' any more, can focus. She is a very good student – good grades. She has excellent wrap-around services at school and [her mother] feels better that she has such strong support from school personnel." Record at 19, *citing* Record at 643.

While this is undoubtedly positive, the ALJ does not seem to recognize that this does not mean that Z.K. does not have a disability. Rather, the note clarifies that Z.K.'s "good grades" were obtained on a special education level, with the help of her "excellent wrap-around services" and "strong support from school personnel." This speaks well of the care Z.K. received, but also emphasizes her need for a great deal of special education.

Further, Z.K.'s therapist also reported on the very same page of the December 8, 2020, Spectrum note:

> I had a long discussion with mom during sister [Z.K.]'s physical appt on 12/3/2020 and again today regarding [Z.K.]. Mom states she struggles with her daily, can never tell how [Z.K.] will be day to day. I again recommended to mom that mental health emergencies are just as important as physical health emergencies. Mom states she feels comfortable with [Z.K.] at home, but I stated strongly to her that should [Z.K.] have more SI [i.e.,

10

self-injury, or possibly suicidal ideation] she needs to be seen at the crisis center or the ER.

Record at 643.

The fact that Z.K. no longer required Adderall to control hyperactive behavior should also be seen in the context of the fact that she was started on sertraline (Zoloft), an antidepressant, at the same appointment. *Id*. ("I told mom I feel comfortable restarting sertraline but at the starting dose to see how she does"). Rather than being hyperactive, Z.K. had become depressed and lethargic during the Covid shutdown: "Typically stays in her room sometimes with lights off." Record at 642 (Spectrum note of December 8, 2020 telehealth visit).

The ALJ also quoted a December 23, 2020, note from Spectrum stating: "Mom feels that [Z.K.]'s mood has been better, coming out of her room more, playing with her sister more." Record at 634. Again, this is a positive development, but it cannot be understood in context without recognizing that Z.K. was reported two weeks earlier to have been staying in her room with the light off.

Elsewhere in her decision, the ALJ did cite to the quotation above about Z.K. staying in her room. Record at 19. However, she did not cite the very next line, where the treatment provider observed: "mom states that she does endorse SI [presumably self-injury] – last time was last week." Record at 642. A Spectrum telehealth note from December 15, 2020, also reported: "mother believes depression has been getting worse as pt gets older coupled with the stresses of this past year." Record at 637. The note continues: "[history of] SI cutting self, most recently a few months ago." *Id*. Clearly, the end of Z.K.'s hyperactive behavior did not mean the end of her mental health symptoms.

These 2020 reports of self-injury are consistent with other evidence in the record. As noted above, the Public Health Management Corporation treatment plan mentioned "self abusive behaviors." A May 1, 2019, treatment note from Public Health Management Corporation stated: "Patient started cutting herself and being involved in three incidences since the last appointment. She informed that she cut herself because she was teased in the school." Record at 482. Another note, from December 22, 2019, states: "[Mobile therapist] met with [Z.K.] asking questions of self harm. She stated she did say she wanted to die at school 'a while ago' but only because the teacher 'made her mad.'" Record at 455.

Another positive quotation in the ALJ's decision which lacks context is her report that Z.K.'s teacher stated in the November, 2020, IEP that she did "not have any behavior concerns at this time ... [The claimant] is an excellent scholar when she puts forth the effort." Record at 20, *quoting* Record at 350. This quote was taken from the following statement: "I do not have any behavior concerns at this time. I do have attendance concerns. I understand that [Z.K.] has been given permission to turn her camera off at times, but it has been a constant." Record at 311, (reproduced on 350). The same teacher stated, on the same page: "[Z.K.] struggles to participate and she does not turn in majority of her work" and "Over the past few weeks I have seen less and less of [Z.K.] and her participation has decreased dramatically." *Id*. Thus, the actual thrust of the teacher's note is that Z.K.'s problematic behaviors were preventing her from being "an excellent scholar."

Further, I agree with Graham that the ALJ's analysis of some of the expert reports is inadequate. Particularly unsupported was her assessment of the report provided by Dr. Brendley, the consulting independent psychologist. After meeting with Z.K. on January 15, 2020, Dr.

Brendley issued a multi-page narrative Child Mental Status Evaluation.  Record at 359.  In it, he described Z.K.'s "Current Functioning" as follows, in relevant part:

> The claimant loses temper easily, deliberately argues, talks back, requires constant redirection, actively defies or refuses to comply with requests, and requires on-on-one attention. … General maladaptive behaviors:  the claimant struggles with tantrums, patterns of lying, school truancy, stealing, fire setting, and deliberate destructive/throwing things.  The claimant struggles with the following ADHD related symptoms:  Fails to pay attention to details, makes careless mistakes, difficulty sustaining attention in tasks or play, fails to follow through on instructions or finish work, refuses to participate, is disorganized, easily distracted, often fidgets and squirms, requires constant redirection, out-of-seat behavior in school, walks out of class, excessive talking, difficulty waiting turn, disruptive, and impulsive. … The claimant endorsed sad moods, extreme irritability, and mood lability.

Record at 360.

Dr. Brendley diagnosed Z.K. with ADHD and "other specified depressive disorder." Record at 362.  He also completed a Source Statement of Functional Abilities form.  Record at 363.  Regarding the domain of acquiring and using information, he wrote "Claimant requires an individualized education plan.  Claimant is in special education classes." *Id*.  As to attending and completing tasks, he wrote:  "Claimant requires regular redirection to sustain attention."  Record at 364.  Under "caring for self", he wrote:  "Client requires redirect and psychotherapy."  Record at 365.

The ALJ wrote:

> In a Medical Source Statement (MSS) dated January 15, 2020, Dr. Brendley opined that the claimant is in special education, requires redirection to sustain attention, has difficulty with bullying, and requires medication and psychotherapy.  The undersigned finds this MSS to be not persuasive as the limitations outlined [are] not entirely consistent with the examination results in the file.

Record at 20.  Yet, it is undisputed that Z.K. was in special education, and required medication and psychotherapy.

Since (as discussed above) Z.K. was diagnosed with ADHD, took Adderall for years, and needed a one-on-one aide to function in a regular classroom, it is also difficult to see why the ALJ would take exception to Dr. Brendley's observation that she required redirection to sustain attention. The ALJ did not point to any specific contradictory "examination results in the file." The results of Dr. Brendley's own examination, however, showed impaired attention and concentration, and impaired recent and remote memory, which he attributed to suboptimal effort. Record at 361. Since Dr. Brendley concluded that Z.K. had limitations in the area of concentration, it is apparent that he did not mean by "suboptimal effort" that Z.K. was faking, but that she was not focused. Record at 364.

The ALJ also found unpersuasive a December 18, 2019, report from Mrs. M. Hawkins, Z.K.'s homeroom and science teacher, who reported that Z.K. had "obvious to serious" problems in acquiring and using information. Record at 20, 196. Mrs. Hawkins also noted "obvious" problems in some functions pertinent to attending and completing tasks, such as "focusing long enough to finish assigned activity" and "working without distracting self or others." Record at 198.

The ALJ wrote: "The undersigned finds this Teaching Questionnaire to be not persuasive as she noted that she has only known the claimant for 4 months." *Id.*, and see Record at 195. However, four months equals an entire school semester. Whereas a doctor who treated a patient for four months might only have seen the patient on a few occasions, Mrs. Hawkins saw Z.K. in person every school day, since her report pre-dated the Covid shutdown. At around the same time she completed this report, Mrs. Hawkins would have had to assign Z.K. a semester grade in science. Certainly, Mrs. Hawkins had a sufficient opportunity to develop opinions about Z.K.

As a whole, therefore, the ALJ's decision contains unsupported conclusions and out-of-context quotations. Crucially, the Social Security regulations specify that a child applicant's functioning will be assessed "compared to the performance of **other children [her] age who do not have impairments**." 20 C.F.R. §416.926a (Bold supplied). Thus, when a child claimant is receiving special needs services pertaining to both her intellectual functioning and her behavior, it is not enough to simply note good report cards, for example, without considering how this places the claimant relative to a typically-developing child of her age.[1]

The decision also contains meaningful factual errors, including the ALJ's failure to realize that Z.K. required emergency mental health hospitalization within the relevant period, followed by months of partial hospitalization. This inevitably undermines her assessment of Z.K.'s psychological condition. I cannot, therefore, conclude that the ALJ's decision was based on substantial evidence.

V.   *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be granted, and the matter remanded to the Agency for more thorough consideration of the evidence, including the context of citations to the record, and adequate explanation for her determinations regarding expert opinions.

                            BY THE COURT:

                            */s/ Scott W. Reid*
                            _____
                            SCOTT W. REID
                            UNITED STATES MAGISTRATE JUDGE

---

[1] I note in this regard that Z.K.'s mid-second grade reading level described in her most recent IEP places her more than three standard deviations below the norm for a sixth grade student, which is defined as an "extreme" limitation by 20 C.F.R. §416.926a(e)(3)(I).